# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 11, 2014

## STATE OF TENNESSEE v. EDWARD SHANNON POLEN

**Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1049     Steve Dozier, Judge**

---

**No. M2012-01811-CCA-R3-CD - Filed April 4, 2014**

---

Edward Shannon Polen ("the Defendant") pleaded guilty to two counts of theft over $60,000 and two counts of securities fraud. After a sentencing hearing, the trial court ordered the Defendant to serve an effective sentence of twelve years in prison. In this appeal, the Defendant challenges the length and manner of service of his sentence. Upon our thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments
of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Patrick G. Frogge, Nashville, Tennessee, for the appellant, Edward Shannon Polen.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and James Milam, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

After being indicted for three counts of theft and six counts of securities fraud, the Defendant pleaded guilty to two counts of theft of $60,000 or more and two counts of securities fraud. The only agreement as to the Defendant's sentence was that he would receive a total of no more than twelve years. After a sentencing hearing, the trial court sentenced the Defendant to twelve years for one of the theft convictions, eleven years for the other theft conviction, and four years for each of the two fraud convictions. The trial court

ordered the sentences to run concurrently and to be served in prison.  In this appeal, the Defendant contends that his sentence is too long and that the trial court erred in denying an alternative sentence.

At the plea hearing, the State provided the following factual basis for the Defendant's plea:

If the matter had gone to trial, the State would call witnesses and their testimony would prove that the defendant, Mr. Polen was introduced to the victim, Terry Woodall in December of 2010, actually December 21st, 2010. And that occurred at the Shoney's in Goodlettsville in Long H[o]llow Pike here in Davidson County.

 Introduction was made by a mutual friend, Mr. Stanfield and was for the purpose of Mr. Polen explaining to Mr. Woodall would he [sic] turn an investment; this investment was to be in the form of promissory notes that Mr. Polen would sell to Mr. Woodall and the monies from these notes would be used to finance the purchase of farm combines which had gone into foreclosure and which were being resold by John Deere Credit for profit.

Mr. Polen presented Mr. Woodall with some forms and invoices that appear to come from Tri-Green Equipment which is a registered John Deere dealer here in Middle Tennessee.  Mr. Polen also was introduced to Mr. Woodall as a Robertson County commissioner which indeed he was.

He proceeded to convince Mr. Woodall to invest in financially $75,000 which occurred on December 23rd, 2010, at which time Mr. Woodall gave three cashiers checks, each in the amount of $25,000 which he had taken out of his bank account.  And in return, he received promissory notes for $61,000 and $14,000 from Mr. Polen.  These notes were to become due January 10th of 2011, making them very short term notes and yield a $15,000 return.

The following day, December 24th, 2010, Mr. Polen convinced Mr. Woodall to invest an additional $30,000 which was done in the form of a cashiers check.  At which point he received another promissory note for 35 – note that was to pay out $35,100 on January 10th.

Following that on December 30th, 2010, Mr. Polen had further conversations with Mr. Woodall [and] told him that there was another really good investment that he could get in on, and at that point Mr. Woodall gave

two more cashiers checks totaling $256,000 to Mr. Polen. In return for those checks, he received promissory notes for $144,000 and $112,000 in term [sic]. These checks [sic] were supposed to yield a total return of $313,700. Mr. Polen also gave Mr. Woodall postdated checks which were made out in the full amount of the principal plus interest on the investments telling Mr. Woodall that the checks were not good at that moment, but would be valid upon maturity.

January 21st, 2011, Mr. Polen – I'm sorry, Mr. Woodall had a conversation with an individual named Chip Smith at Tri-Green Equipment Company at which point he learned for the first time that Mr. Polen's representations concerning the investment in the John Deere [f]arm combines was [sic] not true and was [sic] a fraudulent scheme. He was informed John Deere Credit did not deal with third parties on foreclosed farm equipment, but went after the buyers of that equipment themselves. It was then that Mr. Woodall realized that he was the victim of a scam and contacted authorities.

Following that, several taped conversation[s] were made between Mr. Woodall and Mr. Polen, in which Mr. Polen acknowledged receiving these monies from Mr. Woodall and continuing to promise that the money would be forthcoming. He also gave a series of excuses as to why the money was not being paid on time as to when it was due under the terms of the promissory notes.

These events did occur in Davidson County. All of the money was exchanged in Davidson County and the State recommends the previously announced disposition.

The Defendant acknowledged that this statement was "true and correct."

At the subsequent sentencing hearing, Terry Woodall testified that he was a contractor in West Nashville. He first met the Defendant on December 21, 2010, through Kerry Stanfield. Stanfield told Woodall that he, Stanfield, was investing with the Defendant in some foreclosed farm equipment. At Woodall's meeting with the Defendant, the Defendant advised Woodall that he "had something to do with the State legislature" and that he was connected with the Robertson County Commission. After the meeting, Woodall noticed that the Defendant's vehicle "had a State legislative tag on it."

During this initial meeting, the Defendant indicated that he was seeking an investment of $75,000. The Defendant showed Woodall some documents from Sumner County Tractor

containing information about some farm equipment. Woodall told the Defendant that he would think about it. Woodall did some internet research on the Defendant and determined that the Defendant held the public offices that he claimed. On December 23, 2010, Woodall met the Defendant at a bank, and Woodall gave the Defendant three checks drawn on Woodall's account in the total amount of $75,000. The Defendant was supposed to invest this money in "the piece of John Deere equipment that [Woodall] was purchasing at the foreclosure auction." Later in the day, Woodall gave the Defendant another check for $30,000. On December 30, 2010, Woodall gave the Defendant two additional checks totaling $256,000. At the Defendant's request, Woodall made one of these checks out to R and A Properties in the amount of $112,000. In return for these checks, the Defendant gave Woodall promissory notes and post-dated checks.

The Defendant never paid Woodall any money. At one point, the Defendant offered to wire Woodall $100,000, but Woodall refused to give the Defendant his bank account number. Woodall spoke with Kip Smith, the owner of Sumner County Tractor, and learned that he had been defrauded.

On cross-examination, Woodall clarified that the tag he saw on the Defendant's vehicle was on the front. He also clarified that the Defendant told him that he, the Defendant, was on Governor Bredesen's staff. Woodall's research revealed that the Defendant had been appointed to "the collection board." Woodall also clarified that he was "using staff as a broad term meaning [Gov. Bredesen] appointed him to a board."

Terry Stanfield testified that he had known the Defendant for about one month when he introduced the Defendant to Woodall. Stanfield had been betting with the Defendant on sporting events. After Stanfield introduced Woodall to the Defendant, Stanfield warned Woodall not to invest over $20,000 because he did not know the Defendant very well. Stanfield stated that he had invested $13,000 with the Defendant to buy some foreclosed tractor equipment through Sumner County Tractor. The Defendant repaid Stanfield's investment plus $1,500.

Chris Bennett testified that he worked for Ron Wall, who owned a holding company named R and A Properties ("R & A"). On December 30, 2010, the Defendant gave Bennett the $112,000 check which Woodall had written to R & A. Wall earlier had told Bennett to deposit this check into the R & A account. When Bennett asked the Defendant who Woodall was, the Defendant stated that Woodall was one of his partners. Bennett deposited the check into the R & A account.

4

Bennett testified that Wall had invested approximately $1,300,000 with the Defendant and that Wall was concerned about repayment. The Defendant eventually repaid approximately $500,000, and Wall obtained a default judgment for the remainder.

David Zicolla testified that he was an investigator with the District Attorney's Office in Nashville. He investigated Woodall's case. In conjunction with the investigation, Woodall wore recording equipment during two meetings with the Defendant. During the second meeting, the Defendant blamed a person named Wilson for the delay in repaying Woodall's investment.

Trey King testified that he was an investigator with the Tennessee Attorney General's Office. In late 2010 and early 2011, he participated in the investigation of the Defendant. The Tennessee Bureau of Investigation and several federal agencies also were investigating the Defendant. King identified twenty-five to thirty victims who had invested in excess of $10,000,000 with the Defendant. He participated in a search of the Defendant's residence and the contents of the Defendant's truck. The items recovered included tax returns, bank statements, a settlement statement for the purchase of real estate, a W-2(G) reflecting gambling winnings, and a "total of $309,000 in various currency wrappers or denominations, either [$]2,000, [$]10,000, and . . . [$]1,000 respectively." These wrappers were admitted into evidence.

Ginger Carlisle testified that she was the Defendant's ex-wife. They divorced in July 2011. While they were married, the Defendant ran Polen's Lawn Care in Greenbrier, Tennessee. She did the bookkeeping for this business. She was not aware of the Defendant's other business dealings, and they filed separate tax returns. She knew that the Defendant gambled. She also knew that the Defendant was a county commissioner, the Chairman of the Democratic Party in Robertson County, and a member of the Governor's Collection Board. The Defendant ran for the state legislature in 2010 and became depressed when he lost the election.

On cross-examination, Carlisle stated that the Defendant was an excellent father to both their daughter and to her son, the Defendant's step-son.

Special Agent Joel Wade of the TBI conducted forensic investigations of electronic devices recovered from the Defendant's residence. He identified several emails between the Defendant and Ann West discussing West's investment of $60,000 with the Defendant in May 2010 that had not been repaid. The emails were admitted into evidence.

Shirley Ann Frazier West testified that she invested $60,000 with the Defendant. She eventually was paid a total of $11,800.

5

Dennis Wade, a certified public accountant, testified that the Defendant had been a client of his for fifteen to twenty years. Wade prepared the Defendant's tax returns. The Defendant's 2009 return reflected an income of $34,374 from the lawncare business. The Defendant did not provide him with bank statements.

Jo Hughes testified that she was the director of security for F & M Bank in Clarksville. In 2009, the Defendant had two accounts with F & M Bank. One of these accounts was a d/b/a account for Polen's Landscaping. The other account was a "special" account. From December 2009 through July 2011, she prepared eight suspicious activity reports on the Defendant's accounts. During 2009, she also filed approximately ninety currency transaction reports on the Defendant's accounts. In 2010, she filed approximately twenty-two currency transaction reports. The bank developed concerns over the Defendant's banking activities. For instance, in December 2009, the Defendant's landscaping business account reflected deposits and withdrawals totaling approximately $880,000, an amount she described as "highly unusual for a landscaping business to have . . . in December." During the same month, the Defendant's "special" account showed deposits and withdrawals of approximately $550,000. In January 2010, she sent the Defendant a letter notifying him that his accounts with the bank would be closed later that month. She testified that the bank had "fears that these accounts were being used for illegal activity."

Wilson Webb testified that he was involved with the Defendant in investments "to help out the Tennessee Valley Authorities to clean up the coal ash spill." Webb invested between $750,000 and $800,000 in this venture. He lost his investment. His son and two daughters also invested and lost a total of approximately $210,000. These investments were made in 2009 and 2010.

The Defendant made an allocution in which he apologized to Woodall.

The trial court took this matter under advisement and later issued a written sentencing order. In determining the length of the Defendant's various sentences as a Range I offender, the trial court considered that the Defendant had a previous history of criminal behavior consisting of "a criminal enterprise" that the Defendant conducted "for many months prior to . . . December 2010."[1] The trial court also considered as enhancement factors the "particularly great" damage done to Woodall and that the Defendant "used his elected and appointed positions with State and local government to facilitate his theft." In consideration of these factors, as well as several mitigating factors to which the trial court gave little weight, the trial court sentenced the Defendant to the maximum term of twelve years for one

---

[1] The trial court additionally described this enterprise as "an eighteen month long process of swindling victims out of their money for [the Defendant's] personal greed and gain."

of the theft convictions,[2] to eleven years for the other theft conviction, and to four years for each of the fraud convictions.[3] The trial court ordered all of the sentences to run concurrently.

In conjunction with considering the Defendant's potential for rehabilitation and the manner in which the Defendant should serve his effective twelve-year sentence, the trial court made the following findings:

> The proof showed that in 2009, the defendant's lawn care company netted $34,274. Gross receipts at his lawn care business totaled $229,390 with a gross income of $127,658. Obviously the sums of money the defendant was involved with through his bank did not come from his lawful business. There was no proof that any gambling problem the defendant may have led to the disappearance of multi-millions of dollars in cash. There was only a $2000 receipt from casino winnings, some casino credit cards and testimony about the defendant going to Tunica. In sum, the testimony demonstrates that the defendant was involved in a fraudulent scheme over a year and a half that culminated in the theft of $361,000 from Terry Woodall. The defendant had a long standing pattern of deception: deceiving the victim, bank, wife and other victims who relied on his conning abilities.

Based on this proof, the trial court ordered that the Defendant serve his effective twelve-year sentence incarcerated "in order to avoid depreciating the seriousness of the offense and to deter this defendant specifically and others from similar schemes."

In this appeal, the Defendant contends that the evidence did not support consideration of the enhancement factor for abuse of a position of public trust. The Defendant also contends that the trial court should have imposed an alternative sentence.

### Standard of Review

Prior to imposing sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

---

[2] Theft of $60,000 or more is a Class B felony. Tenn. Code Ann. § 39-14-105(5) (2010). The Range I sentencing range for a Class B felony is eight to twelve years. Id. § 40-35-112(a)(2) (2010).

[3] Securities fraud is a Class D felony. See Tenn. Code Ann. §§ 48-2-121 (Supp. 2010), 48-2-123(a) (2002). The Range I sentence for a Class D felony is two to four years. Id. § 40-35-112(a)(4).

7

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1), (3)(C) (2010). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2010).

Our Sentencing Act also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

8

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2010).

Additionally, a sentence including confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401 (2010), Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

## Analysis

### Length of Sentences

The Defendant argues that the trial court should not have considered as an enhancement factor that the Defendant abused a position of public trust. See Tenn. Code Ann. § 40-35-114(14) (2010). He asserts that he "did not defraud Mr. Woodall in his capacity as a public servant." The State responds that the Defendant informed Woodall of his public offices "in an attempt to legitimize his phony scheme and persuade a trusting person to invest large amounts of money." We agree with the State.

Tennessee Code Annotated section 40-35-114(14) provides that a trial court may consider as an enhancement factor that "[t]he defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or the fulfillment of the offense." Tenn. Code Ann. § 40-35-114(14). Before a trial court considers this enhancement factor, it must first find that the defendant occupied a position of either public or private trust. See State v. Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996). "If the evidence supports that finding, then the court must determine whether the position occupied was abused by the commission of the offense." Id.

Woodall testified that, during their initial meeting, the Defendant advised him that he was connected with the State legislature and the Robertson County Commission. Woodall verified through independent research that the Defendant was a Robertson County commissioner and that he had been appointed to "the collection board." Other proof in the record established that the Defendant, in fact, did hold these positions of public trust. Finding the Defendant to be truthful in this regard, and based on his friend's reference, Woodall decided to invest with the Defendant. Clearly, the Defendant advised Woodall of his public offices in order to inspire Woodall's trust. The Defendant had no other reason to advise Woodall of this information because the Defendant's proposed business dealings with Woodall had nothing to do with the Defendant's performance of his public office duties. Thus, the Defendant used his public offices in a manner designed to facilitate his defrauding Woodall. Unquestionably, such use of a public office qualifies as an abuse of public trust for enhancement factor purposes. Accordingly, we hold that the trial court did not err in the exercise of its discretion in considering this enhancement factor. Therefore, the Defendant is entitled to no relief on this basis.

### Denial of Alternative Sentence

Prior to the sentencing hearing, the defense filed a sentencing memorandum with the trial court seeking split confinement. As set forth above, the trial court ordered the

10

Defendant to serve his sentence incarcerated. The Defendant now contends that the trial court "failed to follow Tennessee's well-settled procedure for denying an alternative sentence." Specifically, he argues that the trial court ordered confinement as necessary to avoid depreciating the seriousness of the offenses and as particularly suited to provide an effective deterrence to the Defendant and others, see Tenn. Code Ann. §§ 40-35-102(3)(A), -103(1)(B), without making the requisite findings that the offenses were "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree." State v. Bottoms, 87 S.W.3d 95, 103 (Tenn. Crim. App. 2001) (citations omitted).

Our supreme court has held that the Bise standard of review also is applicable to "questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). Thus, in reviewing a trial court's denial of split confinement, the applicable standard of review is abuse of discretion with a presumption of reasonableness so long as the sentence "reflect[s] a decision based upon the purposes and principles of sentencing." Id.

Initially, we note that the Defendant's twelve-year sentence rendered him ineligible for probation. See Tenn. Code Ann. § 40-35-303(a) (2010) ("A defendant shall be eligible for probation under this chapter if the sentence actually imposed upon the defendant is ten (10) years or less."). The Defendant's ineligibility for probation also precluded him from a sentence of split confinement. See Tenn. Code Ann. § 40-35-306(a) (2010) (providing for the possibility of split confinement for defendants receiving probation).

Moreover, we hold that the trial court's sentencing order was adequate under our limited review pursuant to Caudle. Although the trial court did not use the specific words referred to in Bottoms, the trial court's order makes clear that it found the Defendant's conduct to be outrageous and deserving of incarceration. We agree. Furthermore, in light of our limited scope of review, this Court has questioned the continuing viability of Bottoms. See State v. Delavan Benjamin Mohammed, No. M2011-02552-CCA-R3-CD, 2013 WL 1874789, at *6 (Tenn. Crim. App. May 3, 2013) ("In light of Bise and Caudle, we question the continued validity of the proposition that [denying an alternative sentence in order to avoid depreciating the seriousness of the crime] requires that the circumstances of the offense 'as committed, be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree.'") (quoting Bottoms, 87 S.W.3d at 103), perm. app. denied (Tenn. Oct. 16, 2013).

11

## Conclusion

We hold that the trial court did not err in the exercise of its discretion in ordering the Defendant to serve an effective sentence of twelve years in the Tennessee Department of Correction. Accordingly, we affirm the trial court's judgments.


_____
JEFFREY S. BIVINS, JUDGE